[No. 2304]

WELLESCA P. ALLEN, APPELLANT, v. WILFRED
P. ALLEN, RESPONDENT.

[193 Pac. 539 ; 196 Pac. 843]

1. APPEAL AND ERROR—OBJECTIONS TO DEPOSITIONS NOT AVAILABLE
   UNLESS URGED BEFORE THE TRIAL COURT.
   Objections made on the taking of depositions, not shown by
   the record to have been urged on the court during the trial,
   cannot be considered on appeal.

2. DIVORCE—DEPOSITIONS TENDING TO SHOW DEFENDANT NONEXIS-
   TENT AND THAT PLAINTIFF WAS GUILTY OF ADULTERY HELD
   ADMISSIBLE.
   In a divorce case, deposition of witnesses tending to show
   either that there was no such person as the alleged defendant
   or that, if there was, plaintiff had been guilty of adultery
   with another, were admissible.

3. DIVORCE—EVIDENCE SHOWED NONEXISTENCE OF DEFENDANT AND
   PLAINTIFF'S ADULTERY.
   In an action for divorce, evidence held to show that the
   named defendant was a fictitious person and that plaintiff was
   guilty of adultery.

ON PETITION FOR REHEARING

1. DEPOSITIONS — OBJECTIONS TO FORM OF QUESTION OR ANSWER
   MUST BE MADE ON TAKING, BUT OBJECTIONS TO MATERIALITY OR
   COMPETENCY MAY BE MADE AT TRIAL.
   Objections going only to the form of questions or answers
   should always be made at the time a deposition is taken, that
   the opposing party may have an opportunity to correct the vice,
   and, if not then made, cannot be urged on the trial; but
   objections going to the materiality or competency may be
   first made on the trial, and, if made before trial, must. be
   renewed on the trial.

2. APPEAL AND ERROR—REFUSAL TO RULE ON OBJECTIONS MUST BE
   ASSIGNED AS ERROR.
   If the court refuses to rule on objections to the materiality
   or competency of evidence given by deposition, such misconduct
   must be assigned as error.

APPEAL from Second Judicial District Court, Washoe
County; T. C. Hart, Judge.

Action for divorce by Wellesca P. Allen against
Wilfred P. Allen. Judgment for defendant, and plaintiff
appeals. **Affirmed. Petition for rehearing denied.**

A. Grant Miller, for Appellant:

All the allegations of the complaint were clearly and

fully established by competent and relevant testimony. Each and all of the assignments of error are based upon objections regularly made in the trial court, whose duty it was to rule upon them. The fact that the appellant was not accorded all her rights and privileges in the lower court furnishes no reason why she should be denied by the appellate court the benefit of her objections.

The burden rests on the opposition to prove their three propositions—adultery, nonexistence of defendant, and nonresidence of the plaintiff in the jurisdiction. When everything necessary to a marriage and its validity is shown, the validity will be presumed. Cartwright v. McGowan, 121 Ill. 388. There is a strong presumption in favor of the legality of every marriage. 16 L. R. A. (N.S.) 98, 99, and note. The law is so positive in requiring one who asserts the illegality of a marriage to take the burden of proving it that such requirement is in force, even though it involves the proving of a negative. Schmisseur v. Beatric, 35 N. E. 525; 74 L. R. A. (N.S.) 940.

While adultery may be proved by circumstantial evidence, such evidence must be clear, strong, and cogent. Suspicions, however great and numerous, cannot form a basis for a legal decision. There is a presumption of innocence in favor of the appellant, as a matter of law, and it must be overcome by more than a mere preponderance of proof. People v. Johnson, 57 Cal. 571.

Circumstantial evidence must be such as would lead the guarded discretion of a just mind to the conclusion of the truth of the charge. Aitchison v. Aitchison, 68 N. W. 573; Blackman v. State, 36 Ala. 295; State v. Thompson, 133 Iowa, 741; Thare v. Thare, 101 Mass. 111; United States v. Greigo, 75 Pac. 30. Evidence should be so cogent as to exclude every reasonable hypothesis except that of guilt. State v. Crowley, 13 Ala. 172; Lighter v. State, 126 Ga. 563. The fact must be established, not only by fair inference, but as a

necessary conclusion. Appearances indicating guilt, but still not inconsistent with innocence, are not sufficient. Phillips v. Phillips, 52 N. Y. S. 489. If the facts shown may be reconciled with innocence, they are insufficient to sustain a conviction. Weaver v. State, 74 Ga. 376; ·State v. Moss, 73 Wash. 430.

Failure on the part of the defendant to introduce · evidence showing good character raises no presumption of guilty conduct. 20 L. R. A. 609.

*Brown & Belford, Amici Curiæ:*

The evidence proved adultery by the appellant, as well as that the alleged defendant was a fictitious person.

The trial court was the exclusive judge of the credibility of the witnesses. The evidence being conflicting, and there being substantial evidence to support them, the findings of the trial court are conclusive. Dixon v. Miller, 184 Pac. 926; Thompson v. Tonopah L. Co., 37 Nev. 183; Leete v. S. P. Co., 37 Nev. 49; Robinson M. Co. v. Riepe, 37 Nev. 27; Turley v. Thomas, 31 Nev. 181; Gardner v. Gardner, 23 Nev. 215; McNamee v. Nesbitt, 24 Nev. 400; Anderson v. Feutsch, 31 Nev. 501.

By the Court, COLEMAN, C. J.:

This is an action for divorce on the ground of nonsupport. Service of summons was made by publication. The defendant failing to appear, and other circumstances seeming to justify such action, counsel were asked to appear as amici curiæ. The decision and judgment of the trial court having been adverse to the plaintiff, and a motion for a new trial having been denied, an appeal has been taken.

While counsel appearing as amici curiæ admit that plaintiff was a party to a marriage ceremony on September 5, 1906, as alleged in the complaint, it is contended (1) that there is in fact no individual by the name of Wilfred P. Allen, but that Dr. Harrison G. Dyar, or some other person, at the time of the performing of the marriage ceremony, impersonated Wilfred P.

Allen; and (2) that if there is in fact a Wilfred P. Allen, the plaintiff is not entitled to a divorce, because of adulterous conduct on her part long prior to the time when it is claimed he failed to support her.

1.  Appellant has assigned something like 250 errors, most of them going to alleged erroneous rulings upon certain objections to testimony taken by deposition. A great majority of the assignments may be disposed of summarily, for the reason that it appears that, while objections were made to certain questions propounded during the taking of the depositions, the record fails to show that the objections so made, or any others, were urged upon the court during the trial or at any other time, or that the court ruled upon those made at the time of the taking of the depositions. This being true, it cannot be said that the court committed any error as to such matters, and we are powerless to consider the assignments.

2.  Upon the trial, and after the depositions of Richard M. Hicks, Alma Stover, Catherine Booth, Louise Baker, Karl Vaupel, and Joseph Davis had been read in evidence, an objection was made that such depositions as a whole were irrelevant, incompetent, and immaterial, in that they do not tend to establish or disprove any issue in the case, or any of the contentions urged by counsel appearing as amici curiæ. The objections so made were overruled by the court, in which it was clearly right, for the reason that all of said witnesses testified to circumstances which, in connection with the other evidence, tended to show, either that there is in fact no Wilfred P. Allen or that the plaintiff had been guilty of adultery with Dr. Dyar, or both.

3.  The evidence consists of 1,000 typewritten pages, and we would feel justified in affirming the judgment without reviewing the testimony; but, in view of the apparent seriousness with which it is insisted that the evidence does not justify the findings and judgment, we will review the facts as briefly as possible. In the year 1900, Dr. Dyar, an entomologist of some note and an

employee of the government, his wife, son, and daughter, while spending their vacation at a summer resort in Virginia, became acquainted with the plaintiff. In the fall, after all the parties had returned to Washington, where plaintiff followed the vocation of a kindergarten teacher, she (then Miss Wellesca Pollock) applied to Dr. Dyar for employment for the hours after school, which she obtained. As time went by, she became intimate with the family of the doctor. He was a man of wealth, owning realty in New York of the value of over $400,000, and property of a like value in Washington. It seems he was dealing quite extensively in Washington realty, all of which, except his home, eventually stood in the name of Miss Pollock. Mrs. Dyar, learning of this, became displeased, and objected to such a course of conduct toward Miss Pollock. An estrangement sprang up between the doctor and his wife; the friendship between him and Miss Pollock becoming all the while more firmly cemented. In the spring of 1906, Dr. Dyar's family went to Los Angeles for a trip. In May of that year the doctor followed. About the same time that the doctor planned to go to Los Angeles, Miss Pollock was inspired to make a visit to Pasadena. They met in Arizona, and spent several days together in the Grand Canyon; Dr. Dyar going on to his family and Miss Pollock to Pasadena. After they had been in California some time, Dr. Dyar's mother-in-law came home one evening with the news that she had met Miss Pollock in Pasadena, at which Dr. Dyar feigned great surprise. While the doctor had made it a practice to keep a diary, in which he entered everything of interest to him which it was safe to note, he did not enter therein the fact of having traveled through the Grand Canyon with Miss Pollock, or note that he had seen her on the trip, but did note therein the fact of his meeting her in Los Angeles after she had been brought to light by the accidental discovery of his mother-in-law.

In due season the parties returned to Washington, and on September 5, Miss Pollock's marriage was

solemnized in Richmond, Va., to a real or impersonated Wilfred P. Allen. From this time on her movements, and those of the mystical Mr. Allen, were such as to cause a great deal of gossip among her relatives and friends in Washington. To go back a few months, the plaintiff testified that while spending an hour between trains in Chicago, while on her trip to Pasadena in May, she became engaged in conversation with a gentleman in the depot. Being an enthusiastic devotee of the Bahai Revelation—a Persian religious sect—she claims to have spoken to him thereof, obtained his name and address, and later sent him literature pertaining thereto. This led to correspondence, and later to a proposal of marriage by Mr. Allen, the party whom she claims to have met in the depot. She testified relative to consulting Dr. Dyar as to the wisdom of accepting the proposal, and of his having urged her to accept the same and raise a family of children, and that as an inducement to her doing so he generously offered financial assistance in the venture, should it be needed. She also testified that at the time of meeting Mr. Allen he was a railroad conductor, with headquarters at Pittsburg. It is an admitted fact that none of her relatives, friends, or acquaintances, except Dr. Dyar, ever met or saw Mr. Allen, though they were exceedingly anxious to do so. There is testimony to the effect that Allen insisted upon being kept out of sight and that plaintiff cooperated with him in this effort.

Allen never lived in Washington, but about the time of his marriage it is claimed that he gave up his railroad job and went into the employ of a well-to-do Mr. McGrath, of Philadelphia, as a kind of secretary, whose residence and street address the plaintiff never knew, nor did she know of any other address of her husband than "General Delivery," Philadelphia. From Mr. McGrath she testified that Allen received the munificent salary of $65 per month and the hope of future reward. On direct examination plaintiff testified that immediately after their marriage they went on a honeymoon

trip to Pittsburg; but so devoid seems to have been the honeymoon of impressive incidents that it made no marked impression on her, for on cross-examination she testified that the honeymoon trip was about Christmas-time.

Shortly after the marriage—whether to a real or an impersonated Mr. Allen—plaintiff was ensconced in a flat in Washington and devoting her time to Dr. Dyar; Mr. Allen, she claims, coming for a visit from time to time. She says that the doctor visited her apartment but seldom for several months, after which he began to take his lunch with her, his visits becoming more frequent as time went by. Finally a baby boy was born; and another, and then another; but, notwithstanding the fact that Mr. Allen was, according to her testimony, living in Philadelphia, only a few hours' ride from Washington, he did not show himself on any of those occasions. Her relatives and friends became doubting Thomases, and evidently their attitude began to disturb the peace of mind of Mrs. Allen and Dr. Dyar, for they proceeded to concoct evidence to prove the existence of Allen, in the hope of allaying suspicion. They made him a bank depositor. He knew nothing of his good fortune in this respect, for the doctor furnished the money, and plaintiff testified that at the time of opening the account she did not know where Allen was. While nurses testified they had never seen Mr. Allen at times of accouchement, they gave evidence of the frequent presence of Dr. Dyar on such occasions; of his lying on Mrs. Allen's bed after the birth of one of the children. The doctor furnished the money to build a house in Washington for the plaintiff. He claims that the money thus expended was profit on a certain deal made by him in her name, and that he took that means of compensating her for her kindness. There is evidence of many other loans to Mrs. Allen. He proved as good as his given word, made before and as an inducement of the alleged marriage.

The estrangement between the doctor and his wife

continued to increase. While his family was away on
a summer outing, he, as he testified, was taken sick.
He went to consult a physician, who, instead of having
him removed to a hospital, had him taken to the house
of Mrs. Allen, though she was not a nurse and had
three children to care for, and when his own family
returned from the summer outing he refused to go to
his home. Later in the year (1914) he went, as he and
plaintiff testified, to Florida and Nassau, on one of
the near-by islands, for his health; plaintiff accompany-
ing him, as she testified, in the capacity of nurse. While
on that trip she found it necessary to write a letter to be
read to the eldest boy by Mrs. Leech, the caretaker of
the children, with whom they had been left in Washing-
ton, the purpose of which was to impress upon the mind
of the boy that "Papa" Allen really existed.

After the return of Dr. Dyar and Mrs. Allen from
Nassau, and some time in March, 1915, Mrs. Allen
wrote to an attorney in Reno relative to procuring a
divorce for herself and two others. She was so satisfied
with the results of the correspondence that in the month
of June, 1915, she and her three children, Dr. Dyar,
Mrs. Leech (an assistant to Mrs. Dyar), her two chil-
dren, and a niece sailed from New York to San Fran-
cisco, and on the day after their arrival at that port
left for Reno, where a rented house awaited the party,
in which they took up their residence. After they had
been in Reno a few days differences arose between Mrs.
Leech and Mrs. Allen and Dr. Dyar, and shortly there-
after the first-named returned to Washington. In due
time, and simultaneously, suit for a divorce was insti-
tuted both by Mrs. Allen and Dr. Dyar. Mrs. Leech
and her husband testified to catching Mrs. Allen and Dr.
Dyar in the act of adultery on two or more occasions,
which was flatly denied by the doctor and Mrs. Allen.

The foregoing is a skeleton of the case, into which we
shall weave further facts as we proceed. Counsel for
plaintiff assert that it is made to appear that the

evidence of the Leeches is perjury, and that there is no substantial evidence to sustain the judgment. Certain portions of the testimony of the Leeches seem improbable, and we think counsel appearing as amici curiæ take the same view; but it is safe to say the same of much of the testimony of Mrs. Allen and Dr. Dyar. At least the trial court was evidently of that opinion. We quote from his decision:

"I cannot understand how any one could listen to the evidence of the plaintiff, and watch her conduct and demeanor upon the stand, without being impressed with her absolute lack of sincerity. *. * * I find but little, indeed, if anything, which cannot be harmonized with the theory advanced by counsel on behalf of the court; that is, that there is not, and never was, any such character as the defendant named. * * * Plaintiff's case, to say the least, is too clouded with doubts and questionable circumstances. * * * Upon the issue as to whether, under such circumstances as shown by the evidence in this case, the defendant would be obligated either legally or morally to provide for plaintiff, for, considering her manner of living during the period complained of, to say nothing of the evidence of the witness Dyar, and almost innumerable instances and circumstances, the conclusion is almost inevitable that this plaintiff and the said witness Dyar were at the time of the filing of the complaint, and for many years prior thereto had been, living in adultery."

It is a well-established rule of law in this state that, where the evidence is conflicting, the judgment of the trial court will not be disturbed, if there is substantial evidence in the record to support the judgment. Dixon v. Miller, 43 Nev. 280, 184 Pac. 926. That the evidence is conflicting will not be denied. Is there substantial evidence in the record to support the findings and judgment? Unquestionably. The trial court was justified in its conclusion that Wilfred P. Allen was a product of the minds of the plaintiff and Dr. Dyar.

But why was it ever necessary that the plaintiff go through the form of being married? Two reasons may be assigned: First, to provide a father for the children; and, secondly, to allay the suspicions of the friends and relatives of the respective parties of any improper conduct on the part of the plaintiff and Dr. Dyar. The story as to the reason offered by the plaintiff for the unwillingness of Mr. Allen to show himself is not only unnatural and unreasonable, but has all the earmarks of fiction. The plaintiff testified that Mr. Allen was going under an assumed name, because he had committed an act which made it unwise for him to go by his right name or show himself in Washington; that he was supposed to have been drowned, but had miraculously escaped; that he had even concealed his escape from his brokenhearted mother and father, the latter a prominent railroad official in the West. But she did testify that he went to Washington from time to time to see her; that he knew of the suspicions of the plaintiff's relatives and of the feeling of Mrs. Dyar, and that to allay that suspicion and reestablish her in their esteem he copied, signed, and mailed to Mrs. Dyar and plaintiff's brother letters which had been drafted by plaintiff and Dr. Dyar.

Can any one believe such a story? Is it possible that a devoted husband, the chastity of whose faithful and loving wife is in question, and in whose purity he has unbounded confidence, would fail to come forward and show himself to his wife's sisters, brother, and friends, and to Mrs. Dyar? None of them were interested in prosecuting him, but were anxious as to plaintiff's standing in the esteem of their friends. Most men will fight when scandal is uttered concerning a faithful wife, yet in this case it is sought to make the court and the relatives and friends believe that a man exists who will write letters to prove his existence, but who will not show himself to clear a devoted and pure wife of suspicion.

But we have another fiction, the product of the fertile

minds of plaintiff and Dr. Dyar, to allay suspicion. An account was opened in one of the Philadelphia banks in the name of the defendant by the plaintiff, the money ($1,800) being furnished by Dr. Dyar. Checks were drawn upon the account to pay the attending nurse and the doctor at the time of the birth of the children, as well as plaintiff's brother, for accommodations at his resort for plaintiff and the children. The testimony of the plaintiff relative to the bank account is very unsatisfactory. She testified that she did not know whether Mr. Allen was in Philadelphia or in the West at the time of the opening of the account. He seemed not to have known of his good fortune at the time the account was opened, and never to have deposited a dollar to the account, nor to have drawn one from it for his personal use. He simply was one of those husbands who would obey orders, so long as they were limited to writing letters, signing checks, and such routine, but who would never let any one see him in Washington.

What was the purpose of this bank account? If the existence of Allen could not be established in the minds of plaintiff's relatives and friends and Mrs. Dyar, then it must follow that the plaintiff, through the miraculous influence of the Bahai Revelation, must have experienced three mystical conceptions, or stand proven in the eyes of her friends an adulteress, and Dr. Dyer shown not to have advanced his money without a reason—rather that he did advance it for a reason other than that given. But, conceding that a good reason did exist for not disclosing himself to the relatives and friends of the plaintiff, what could have been the reason for concealing from the plaintiff the place of residence of the well-to-do Mr. McGrath? None is assigned by the plaintiff; the court is left to surmise. What better reason could have existed than that there was no such person? Another singular thing is that Allen never disclosed to the plaintiff the identity or place of residence of his parents.

But one of the most amazing things of this whole case

is the fact that plaintiff found it necessary while at
Nassau to write a long letter, to be read to her eldest
son, to reestablish confidence in him of the existence of
a father. In that letter she spoke of the probability
of Mr. Allen coming with Mr. McGrath to Nassau for
a visit; but he was not fatherly enough to make a visit
from Philadelphia to Washington to allay the anxiety
of his son's doubt as to his existence. A queer Mr. Allen
he was indeed! In the letter to which we have alluded
the plaintiff stated that "Papa Allen" had given the boy
the nickname "Trilobite," because of a certain habit the
boy had which reminded him of the trilobite. The evi-
dence shows that Mr. Allen was a man of public-school
education, while Dr. Dyar, who admitted in his testi-
mony having called the boy a little "trilobite," was an
entomologist in the employ of the government. To
whom would a court most likely attribute the origin of
the nickname—Dr. Dyar, or the Allen of doubtful exis-
tence? Since the trilobite became extinct in the Paleo-
zoic age, is it likely that one of Allen's limited education
knew anything about the trilobite? Does not Dr. Dyar
loom up in the maze?

Another incident which we might mention was the
plaintiff's testimony relative to her honeymoon trip. On
direct examination she said it was taken at the time
of the marriage. On cross-examination she was at first
somewhat in doubt whether it was at the time of the
marriage or about Christmas-time. While under cross-
examination, and after a recess of the court, during
which she had an opportunity to confer with Dr. Dyar,
she fixed the time positively as being about Christmas-
time. She then said she was able to fix it because she
knew that there was high water at Pittsburg at the
time, and that Dr. Dyar had stated to her that the high
water was at that time. Having in mind the fact that
this testimony was given about ten years after the
honeymoon trip had been taken, it is a most remarkable
circumstance that Dr. Dyar would know about the high

water at that time, or remember it, unless he had been in Pittsburg at the time mentioned. If he was there, was he not the Mr. Allen who was enjoying the honeymoon trip?

Dr. Dyar knew that his wife had been estranged from him, designedly or innocently, by the plaintiff, and it does seem that, if there were no sentimental ties existing between him and the plaintiff, he would never have found it necessary to go the length he did in his course of conduct with the plaintiff. She testified that she went to Nassau with the doctor as a nurse. It is admitted that he did not come to Nevada with the intention of becoming a resident (at least he so testified) and of obtaining a divorce, but the plaintiff came for that express purpose. The doctor went to Nassau—accepting their evidence—to recuperate from an attack of la grippe, and still needed the care of the plaintiff when she came to Nevada. There is no testimony in the record that any doctor had advised Dr. Dyar that his health demanded that he follow the plaintiff on a long ocean trip, and to Reno. After he had arrived in Reno, he followed his profession as an employee of the government, and there is no evidence that he ever had the need of a physician during the entire period between the time he left Nassau and up to the time of the trial. In this view of the case, if no sentimental reasons entered into his accompanying the plaintiff, it might be thought strange that an educated and refined scientist could be so devoid of regard for the feelings of his wife, daughter, and son as to conduct himself as he did, especially since he might have secured the services of a trained nurse to take care of him, had he needed one, and thereby do a bit to allay the suspicion of all as to the relationship existing between him and the plaintiff.

We might continue to point out from the record evidence which in our opinion forges a chain of circumstances which leads irresistibly to the conclusion, not only that there is substantial evidence in the record to

sustain the judgment, but that no other judgment could properly have been rendered in the case.

The judgment is affirmed.

### ON PETITION FOR REHEARING

By the Court, COLEMAN, J.:

In the petition for rehearing it is strenuously contended that the court erred in holding that the objections made to certain testimony during the taking of the depositions of several witnesses could not be considered on appeal, since they had not been urged upon the trial court. In the petition it is said:

"Your petitioner respectfully urges that each and all of these assignments were based upon objections regularly taken, and that it was the duty of the trial court to rule upon them, whether the court so ruled or not, and if the trial court failed to do and perform its duty in these particulars and failed to allow appellant all her rights and privileges in the court below, that that furnishes no reason why appellant should be denied the benefit of such objections in the above-entitled court."

1, 2. In this contention counsel is mistaken. Nothing was before the trial court to rule upon. Objections noted at the time of the taking of a deposition will not be considered by the court unless renewed upon the trial. Objections going only to the form of the question or answer should always be made at the time a deposition is taken, that the opposing party may have an opportunity to correct the vice (McLeod v. Miller & Lux, 40 Nev. 447, 153 Pac. 566), and, if not then made, cannot be urged upon the trial; but objections going to the materiality or competency need not be made at the taking of the deposition, but may be made for the first time upon the trial, and, if made before the trial, the objection must be renewed upon the trial and a ruling insisted upon, and, if the court refuses to rule, the misconduct of the court in so doing must be assigned as error and embodied in the record, for otherwise we may

presume that the objection is waived. In Thomas v.
Boyd, 108 Va. 584, 62 S. E. 346, it was held that where
objection was made at the time a deposition was taken,
but not upon the trial, the objection embodied in the
deposition was deemed waived. To the same effect:
Hancock v. Chapman, 170 Ky. 99, 185 S. W. 813; Rober-
son v. Roberson, 183 Ky. 45, 208 S. W. 19; Tremaine v.
Dyott, 161 Mo. App. 217, 142 S. W. 760; Murray v.
Omaha T. Co., 95 Neb. 175, 145 N. W. 360; 7 A. L. R.
1343.

We are unable to find an authority holding to the
contrary.

While what we have said must necessarily result in
a denial of the petition for a rehearing, we do not desire
to seem disposed to avoid ruling upon the objections
which were made at the time the depositions in question
were taken. As a matter of fact, many of the objec-
tions were well taken. It is true, also, that some of the
objections were frivolous and without merit, as is true
of a large majority of the objections interposed in almost
every trial. But if the objections which were well taken
had been urged upon the court during the trial and
sustained, such rulings could not have affected the
result upon the merits. There is ample competent evi-
dence in the record to show the manner in which Mrs.
Allen and Dr. Dyar had demeaned themselves toward
each other, as outlined in the original opinion.

The petition for rehearing is quite lengthy, and
consists mainly of a singling out of various circum-
stances and building around and about them an argu-
ment to show that each of them, standing alone, does
not make out a case against the plaintiff—all of which
we concede; but the big fact is that, while one circum-
stance may prove nothing, a long train of circumstances,
covering a period of several years, may make out a case
good and strong.

The evidence in the case, as a whole, shows an utter
disregard on the part of Mrs. Allen and Dr. Dyar for

the conventionalities of life. Society is hedged about by certain recognized canons of moral ethics that cannot be violated without incurring a penalty. These canons have grown up and become crystallized—the products of man's knowledge of human nature—and he who defies them well knows that in so doing he is constructing a case against himself in the eyes of decent society. Society demands that these canons of moral ethics be recognized and enforced.

There was ample evidence to justify the judgment.

Petition for rehearing is denied.